# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| CANDICE A. JACKSON, individually and on behalf of all others similarly situated, | Civil No. 2:26-cv-35 |
| Plaintiff, | |
| v. | **COMPLAINT - CLASS ACTION** |
| WOODSTREAM CORPORATION, | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Candice Jackson ("Plaintiff"), by and through her attorneys, make the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge, against Defendant Woodstream Corporation ("Defendant").

## NATURE OF THE ACTION

1.      This is a class action lawsuit on behalf of purchasers of Victor PestChaser Rodent Repellers (the "Repellers") in the United States.

2.      The Repellers purport to repel rodents through "ultrasound" technology.  The packaging states that "[r]odent activity can be reduced in 6 to 10 days," that the Repellers are for "use anywhere indoors," that the Repellers provide "Maximum Coverage," and that "each unit lasts 3 to 5 years:"

///



| PestChaser® Rodent Repeller | |
|---|---|
| Model # | CBM75K |
| Available Sizes | 3-Pack, 6-Pack |
| Size | 1.69" x 1.75" x 1.75" |
| Presentation | Ready-to-Use |
| Power Source | 110V wall outlet |
| For Use In | Average-sized rooms including: <br>• Kitchens <br>• Dining rooms <br>• Bedrooms <br>• Bathrooms <br>• Basements <br>• Living rooms <br>• Garages <br>• Attics |
| Operation | Produces ultrasonic noise at varying volumes and frequencies |
| Number of Devices Included | 1 |
| Longevity | Each unit lasts 3 to 5 years |
| Clean & Humane | Contains no chemicals or poisons |
| Economical | Uses less than a penny a day in energy costs |
| Caution | Do not use PestChaser® around rabbits or pet rodents including gerbils, hamsters, guinea pigs, etc. |
| Feature | Rodent activity can be reduced in 6 to 10 days. |
| Money Back Guarantee | Please view our return and refund policy. |

3.    Unfortunately for consumers, however, the Repellers are a sham.  Decades of studies and dozens of peer-reviewed tests have repeatedly shown that ultrasound does not repel rodents. The Repellers are ineffective and worthless. In fact, video footage shows that mice are unfazed by the Repellers.

4.    Ultrasonic sound waves cannot penetrate solid objects and are readily absorbed by soft objects. Thus, even if the technology was effective in theory, it would not work in practice because furniture, carpeting, cabinets, bedding, and the like readily absorb ultrasonic sound waves. Therefore, Defendant's promise that the Repellers will work in "kitchens, dining rooms, bedrooms, bathrooms, basements and living rooms" are false, deceptive, and likely to mislead a reasonable consumer.

5.    It gets worse.  Ultrasonic sound waves cannot penetrate solid objects, so they do not reach the areas where rodents live and nest. Rodents do not reside in the open. They nest and seek harborage in hidden spots. Yet these spots are precisely the places where ultrasonic sound waves cannot reach. Thus, even if the technology worked (and it does not), the Repellers would

cause rodents to relocate to other parts of people's homes. As Michael F. Potter, a professor of entomology at the University of Kentucky, has explained regarding ultrasonic devices, "[i]f … rodents did happen to avoid the device, control of infestations still would be unlikely since they would simply relocate elsewhere in the building. Using repellents indoors often make pest problems worse since the displaced individuals often repopulate in harder to reach locations (behind and between walls, floors, and ceilings; deep within clutter and storage; hidden voids of cabinets, appliances and furniture; etc.)."[1]

6.    As a result, it is unsurprising that consumer complaints regarding the ineffectiveness of Defendant's Repellers are manifest.

7.    There is only one reason a reasonable consumer would purchase a Repeller – for the advertised purpose of repelling rodents to eliminate or reduce an infestation. But the Repellers will not accomplish this because they do not do that which Defendant promises.

## PARTIES

8.    Plaintiff Candice Jackson is a citizen of Vermont who resides in West Pawlet, VT. Ms. Jackson purchased a Victor 3-pack PestChaser Rodent Repeller with Nightlight from a Vermont Home Depot store, in or about March 2025 for approximately $20.  Prior to purchase, Ms. Jackson carefully read the Repellers' labeling, including the representations that it was a "Rodent Repeller" that uses "high frequency ultrasound" to "repels rodents," and that the Repellers are for "use anywhere indoors." Ms. Jackson understood these statements to mean that the Repellers would effectively repel rodents, and relied on them in that she would not have purchased the Repellers at all, or would have only been willing to pay a substantially reduced price for the

---

[1]    *See Hart v. BHH, LLC*, 1:15-CV-04804-WHP (S.D.N.Y. Mar. 9, 2018), Dkt. No. 135-9 (Expert Report of Dr. Michael F. Potter), ¶ 91.

Repellers had she known that these representations were false and misleading. Ms. Jackson has used the Repellers for several months but observed no reduction in rodent activity. However, Ms. Jackson did not learn that this lack of reduction in rodent activity was due to a defect in the product until November 2025. Ms. Jackson sent a demand letter informing Defendant that its Repellers were ineffective and did not work as advertised on December 22, 2025, a true and correct copy of which is attached as **Exhibit A**.

9.      Defendant Woodstream Corporation is a Pennsylvania corporation with its principal place of business in Lancaster, Pennsylvania. Defendant manufacturers, advertises, markets, distributes, and sells the Repellers throughout the United States.

10.     As the manufacturer and distributor of the Repellers, Defendant possesses specialized knowledge regarding the content and effects of the Repellers, and Defendant is in a superior position to know whether Repellers work as advertised.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

12.     This Court has personal jurisdiction over Defendant because Defendant conducts business in Vermont. Defendant has marketed, promoted, distributed, and sold the Victor Repellers in Vermont, rendering exercise of jurisdiction by Vermont courts permissible.

13.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Plaintiff resides in this District and Defendant does business throughout this District.

14.     All conditions precedent necessary for filing this Complaint have been satisfied and/or such conditions have been waived by the conduct of the Defendant.

<u>**FACTS COMMON TO ALL CAUSES OF ACTION**</u>

A.     <u>**Video Evidence Shows that Defendant's Repellers Do Not Work**</u>

15.     Multiple videos accessible on the Internet show that Defendant's Repellers simply do not work.[2] In one, a simple "mouse feeding station" was constructed. The station consisted of a wooden box with a clear lid. The box contained a small hole for rodents to enter and exit the box:



16.     Sunflower seeds were added to the station, which was left in a barn.  First, the station was tested without the Repeller for several nights. As expected, each night rodents entered to eat the sunflower seeds:

 ///

---

[2]     *See, e.g.*, https://www.youtube.com/watch?time_continue=10&v=yZIy0lRxvPY (last accessed Oct. 7, 2019).



17.    Next, after it was confirmed to be operational, a Victor PestChaser Rodent Repeller was plugged into an extension cord and placed in the station (under the lid) for a night.  The mice were undeterred by the Repeller and continued to enter the station as they had on the previous nights:

///



Mice                                    Defendant's "Repeller"

18.     Based on this, the experiment found:

"Last night we set up the test station in the barn with sunflower seeds and the rodent repeller, and as you can see, all the bait is gone.  Even though we placed seeds only a few inches away from the device, mice had no problem coming in, eating the food.  They didn't seem too bothered by the sound.  This claims to be 'rodent repeller,' but after seeing it in action, I don't think I can recommend this device."

**B.    Decades of Study and Dozens of Peer Reviewed Experiments Show that Ultrasonic Technology Does Not Work**

19.     Entomologists have been examining the efficacy of ultrasonic devices for repelling and controlling rodents, as well as a host of other pests, for decades. These tests uniformly show the same thing: ultrasonic repellers do not work. To date, no peer-reviewed or otherwise credible tests have found such devices to be effective.

20.     After reviewing the data, one textbook summarized: "[t]here are no indications that ultrasonic devices, as a single or long method, will control rodents, and regardless of the desire for a 'magic bullet,' ultrasonic devices are useless for the control of insect pests."[3]

21.      Often called the "bible of pest control," the *Mallis Handbook of Pest Control* states: "Despite a history of 35 years of availability and use, the overwhelming majority of the professionals in the pest management industry on a global scale have failed to embrace ultrasonic devices, even as a supplement to conventional rodent control programs. Certainly, this reluctance cannot be written off as an oversight by on-the-job professionals."[4]

22.     To be sure, it is easy to understand why scientists held hope for ultrasound, which would have been a non-toxic form of pest control. Rodents can hear ultrasound and very briefly may be briefly disturbed by the soundwaves. Unfortunately, they very quickly become habituated to ultrasound and disregard it within hours of activating a device.

23.     That is why one peer reviewed article concluded:

"It is well established that such (ultrasonic) devices will not exterminate, kill, or drive rodents out of a favorable habitat. At best, they may temporarily discourage rodents from visiting areas in buildings that have little cover available… most rats and other rodents quickly become accustomed to any new sound, especially after it has been repeated long enough."[5]

Another peer-reviewed study found that:

---

[3]     Wood, F.E. 1986. Nonpesticidal components essential to pest management. pp.129-162. In *Advances in Urban Pest Management*. (G.W. Bennett and J.M. Owns ed.). New York, NY.

[4]     Corrigan, R.C. 2011. Rats and Mice. pp. 11-149. In *Handbook of Pest Control* (10th edition). (S.A. Hedges ed.). Franzak & Foster, Cleveland, OH.

[5]     Howard, W.E. and R.E. Marsh. 1985. Ultrasonics and electromagnetic control of rodents. Acta Zool. Fennica 173: 187-189.

"None of the units produced anything more than a partial repellency for a day or so which was overcome, regardless of whether the frequency was variable, random, or intermittent."[6]

Another found that:

"In our experiments, ultrasonics did not repel rats and mice from any of the tested areas… Eight years of evaluation of basic principles inherent to the use of acoustical frightening devices produced only negative results. None of the combinations tested will effectively extirpate rodents from a storage building by stimulating their receptors."[7]

Another found that:

"Despite the wide range of decibel levels and frequencies evaluated, strong, sustained repellent effects were never detected…the six devices had insufficient repellency to merit any usefulness in rodent pest control applications, preventive or corrective"[8]

Another found that:

"There have been so many failures reported with high-frequency sound that little can be said in favor of such devices."[9]

24.    An October 2015 paper from the University of Arizona's College of Agriculture & Life Sciences concluded that "Commercially available sonic pest devices for use in residential applications have not been shown to be effective in scientific studies."[10] According to the researchers, "track-record of sonic pest devices has been questionable" since the 1960's and

---

[6]     Meehan, A.P. 1984. *Rats and Mice: Their Biology and Control.* Rentokil Library Series. 383pp

[7]     Sprock, W.L., W.E. Howard, and F.C. Jacob. 1967. Sounds as a deterrent to rats and mice. Journal of Wildlife Management. 31: 729-741.

[8]     Shumake, S.A. 1995. Electronic rodent repellent devices: a review of efficacy test protocols and regulatory actions. In *Repellents in Wildlife Management.* pp 253-270. USDA. Ft. Collins, CO.

[9]     Koehler, A.E., R.E. Marsh, and T.P. Salmon. 1990. Frightening methods and devices/stimuli to prevent mammal damage – a review. In *Proceedings of the 14th Vertebrate Pest Conference.* 168-173. Lincoln, NE.

[10]    Nicholas Aflitto and Tom DeGomez, *Sonic Pest Repellents*, Univ. of Arizona – Cooperative Extension, College of Agriculture & Life Sciences, AZ1639 (Oct. 2015), available at https://extension.arizona.edu/sites/extension.arizona.edu/files/pubs/AZ1639-2015.pdf

1970's.[11] The authors explained that rodents' "dislike [of the ultrasonic sounds] diminished over time, especially after a reliable food source was discovered near the sonic device. Even after the food source was removed the rats and mice continued to explore the room with ultrasonic sound, expressing habituation to the sound."[12]

25.    A study published by University of Nebraska in 1990, concluded that "frightening techniques," including use of ultrasonic devices, "rarely have any appreciable effects on small rodents."[13] Echoing similar findings from earlier studies, the authors again concluded that "rodents habituate to [ultrasonic noise] and will feed or nest alongside the operating devices."[14] The authors also observed that "[t]here have been so many failures reported with high-frequency sound that little can be said in favor of such devises."[15]

26.    A 1998 study published by Utah State University also concluded that mice and rats "become accustomed to new sounds and thus tend to ignore them," rendering ultrasonic repellers ineffective.[16] Due to the rodents' adaptability to sound, the study reiterated, "scientific evidence clearly shows that these devices are not useful in repelling rats or mice."[17]

27.    In November 2017, the Office for Science and Society at McGill University published an article summarizing decades of research into efficacy of ultrasonic soundwave

---

[11]    *Id.*
[12]    *Id.*
[13]    Ann E. Koehler, Rex E. Marsh, Terrell P. Salmon, *Frightening Methods and Devices/Stimuli to Prevent Mammal Damage – A Review*, University of Nebraska – Lincoln, at 171 (Mar. 1990), available at https://digitalcommons.unl.edu/cgi/viewcontent.cgi ?article=1049&context=vpc14
[14]    *Id.*
[15]    *Id.*
[16]    Ben C. West and Terry A. Messmer, *Commensal Rodents*, Utah State University Extension, NR/WD/010, available at https://digitalcommons.usu.edu/cgi/viewcontent.cgi?referer =&httpsredir=1&article=1995&context=extension_histall
[17]    *Id.*

emitting devices to control rodent infestations. The conclusion? "[T]hese devices have never been proven to actually work."[18]

28.     There is no room for dispute on this issue.  Entomologists and other pest control experts have reached a consensus: Ultrasonic devices simply do not work.

**C.    Even If Rodents Were Affected by Ultrasound, the Repellers Would Not Work in the Field**

29.     From flat-earthers to alchemy enthusiasts, even debunked scientific theories can still have proponents. However, even those who "believe" in the efficacy of ultrasonic devices would readily admit that, purely as a matter of physics, they cannot work in any residence or other real-world environment.

30.     As Dr. Potter has explained: "Ultrasonic sound waves are highly directional, and are unable to penetrate or bend around solid objects such as cabinets, doors, furniture, appliances, walls, floors or ceilings. The waves are also rapidly absorbed by soft-textured materials such as cloth, paper, cardboard, and insulation. Consequently, they cannot reach cracks, crevices, voids, corners, and other protected places where most pests live (Koehler et. al 1986; Bomford and O'Brien 1990; Shumake 1995)."[19]

31.     Defendant agrees, as indicated in its attempted disclaimer on the back of the Repeller packaging, which states: "the ultrasound emitted does not travel through walls, furniture, cabinets, or any other object." Defendant nonetheless markets the Repellers for these very uses.

---

[18]     Cassandra Lee, *Are ultrasonic pest repellers effective?* McGill University Office of Science and Society, Nov. 17, 2017, available at https://www.mcgill.ca/oss/article/technology-you-asked/are-ultrasonic-pest-repellers-effective (last visited July 19, 2019).
[19]     *See Hart v. BHH, LLC*, 1:15-CV-04804-WHP (S.D.N.Y. Mar. 9, 2018), Dkt. No. 135-9 (Expert Report of Dr. Michael F. Potter), ¶ 16.

**D.**     **Defendant Continues to Market the Ultrasonic Pest Repellers Despite FTC Warnings**

32.     In May of 2001, the FTC sent warning letters to over 60 manufacturers and retailers of ultrasonic pest-control devices. After investigation, the FTC found that many of the advertisements make explicit false claims about the products' ability to eliminate rodents or repel insects. According to FTC staff, these types of claims may not be in compliance with the FTC Act, which prohibits false and deceptive advertising.

33.     From 1985 to 1997, the FTC brought actions against six companies that made false claims about the effectiveness of ultrasonic devices in controlling rodent and insect infestations.

34.     The types of claims challenged by the FTC included representations that ultrasonic devices can eliminate rodent infestations, repel insects, and serve as an effective alternative to conventional pest-control products, among others.

35.     Despite this regulatory enforcement action, Defendant continues to sell the Repellers.

## CLASS ACTION ALLEGATIONS

36.     Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all others similarly situated.

37.     Plaintiff seeks to represent the following Class:

    All persons in the United States who purchased a Repeller (the "Class").

38.     Plaintiff also seeks to represent the following Subclass:

    All Class members who purchased a Repeller in Vermont (the "Vermont Subclass").

39.     Excluded from the Class and Vermont Subclass are the Defendant, its parents, subsidiaries, affiliates, officers, and directors; those who purchased Repellers for the purpose of

resale; all persons who make a timely election to be excluded from the Class; and the judge to whom this case is assigned and any immediate family members thereof.

40.     Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Class and Vermont Subclass may be expanded or narrowed by amendment or amended complaint.

41.     **Numerosity.** Members of the Class and Vermont Subclass are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class and Vermont Subclass number in the millions. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

42.     **Commonality.** Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to whether Defendant's labeling, marketing and promotion of the Repellers is false and misleading.

43.     **Typicality.** The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff was exposed to Defendant's false and misleading marketing and promotional materials and representations, purchased the Repellers, and suffered a loss as a result of that purchase.

44.     **Adequacy.** Plaintiff is an adequate representative of the Class and Vermont Subclass because her interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they

intend to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

45.    **Predominance.** Pursuant to Rule 23(b)(3), common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class and Vermont Subclass. The Class and Vermont Subclass issues fully predominate over any individual issues because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Defendant's deceptive and misleading practices.

46.    **Superiority.** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

47.    Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to the Class predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

////

## CLAIMS FOR RELIEF

## COUNT I

### Violation of The Vermont Consumer Protection Act
### 9 V.S.A. § 2451, *et seq.*

48.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

49.     Plaintiff brings this claim individually and on behalf of members of the Vermont Subclass against Defendant.

50.     The Vermont Consumer Protection Act, 9 V.S.A. § 2451, *et seq.* ("VCPA") declares in § 2453 that "unfair or deceptive acts or practices in commerce" are unlawful.

51.     Plaintiff is a "consumer" as defined by 9 V.S.A. § 2451(a)(1).

52.     Defendant is a "seller" of "goods" and/or "services" in commerce, as defined by 9 V.S.A. § 2451(a)(2)-(3).

53.     By the acts and conduct alleged herein, Defendant committed unfair or deceptive acts and practices by making false representations on the label of the Repellers.

54.     The foregoing deceptive acts and practices were directed at consumers.

55.     The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the ability of the Repellers to repel rodents.

56.     The foregoing deceptive acts and practices were likely to mislead a reasonable consumer acting reasonably under the circumstances.

57.     The foregoing deceptive acts and practices affected Plaintiff's and the Vermont Subclass' purchasing decisions, to Plaintiff's and the Vermont Subclass' detriment and damage.

58.     Plaintiff and members of the Vermont Subclass were injured as a result because (a) they would not have purchased the Repellers if they had known that the Repellers were

ineffective to repel rodents, and (b) they overpaid for the Repellers on account of the misrepresentations that it is a "Rodent Repeller" that repels rodents through "ultrasound" technology.

59.     On behalf of herself and other members of the Vermont Subclass, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover her actual damages, exemplary damages for three times actual damages, punitive damages, reasonable attorneys' fees and costs, and an order enjoining Defendant's deceptive conduct, and any other just and proper relief available under the VCPA.

## COUNT II

### Unjust Enrichment

60.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

61.     Plaintiff brings this claim individually and on behalf of members of the Class and Vermont Subclass against Defendant.

62.     Plaintiff and members of the Class and Vermont Subclass conferred benefits on Defendant by purchasing the Repellers.

63.     Defendant has knowledge of and accepted such benefits.

64.     Defendant has been unjustly enriched in retaining the revenues derived from Plaintiff's and members of the Class and the Vermont Subclass' purchases of the Repellers. Retention of those monies under these circumstances is unjust and inequitable because Defendant misrepresented that the Repellers are a "Rodent Repeller" that repel rodents through "ultrasound" technology, that "[r]odent activity can be reduced in 6 to 10 days," that the Repellers are for "use anywhere indoors," and that "each unit lasts 3 to 5 years."

16

65.     Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff and members of the Class and the Vermont Subclass is unjust and inequitable, Defendant must pay restitution to Plaintiff and the members of the Class and the Vermont Subclass for her unjust enrichment, as ordered by the Court.

## COUNT III

### Breach of Express Warranty

66.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

67.     Plaintiff brings this claim individually and on behalf of members of the Class and Vermont Subclass against Defendant.

68.     In connection with the sale of the Repellers, Defendant, as the designer, manufacturer, marketer, distributor, and/or seller issued written warranties, which became the basis of the bargain, by representing that the Repellers are a "Rodent Repeller" that repel rodents through "ultrasound" technology, that "[r]odent activity can be reduced in 6 to 10 days," that the Repellers are for "use anywhere indoors," and that "each unit lasts 3 to 5 years."

69.     In fact, the Repellers do not conform to the above-referenced representations because the Repellers are ineffective. Accordingly, Defendant breached the terms of the warranty between the Parties including the express warranties on the Repellers labeling by not providing the Repellers in a manner that conformed to the affirmations and promises.

70.     Plaintiff and the members of the Class and the Vermont Subclass were injured as a direct and proximate result of Defendant's breach because (a) they would not have purchased the Repellers if they had known that the Repellers were ineffective to repel rodents, and (b) they

overpaid for the Repellers on account of the misrepresentation that it is a "Rodent Repeller" that repels rodents through "ultrasound" technology.

71.    Plaintiff and the members of the Class and the Vermont Subclass performed all conditions precedent under the contract between the Parties.

72.    Within a reasonable time of discovering the breach of express warranty by Defendant, Plaintiff notified Defendant of the breach of warranty (*see* **Exhibit A** attached). The notice was sufficient to let Defendant know the nature of the breach (*see* **Exhibit A** attached).

## COUNT IV

### Fraud

73.    Plaintiff hereby incorporates by reference and re-allege each and every allegation set forth above as though fully set forth herein.

74.    Plaintiff brings this claim individually and on behalf of the members of the Class and Vermont Subclass against Defendant.

75.    As discussed above, Defendant intentionally misrepresented on the Repellers' packaging that they are a "Rodent Repeller" that repels rodents through "ultrasound" technology.

76.    The false and misleading representations and omissions were made with knowledge of their falsehood. Defendant is a top distributor of pest repellant products in the United States that is undoubtedly aware of the studies finding that its product does not work and of the FTC investigation referenced above. Nonetheless, Defendant continues to sell its ineffective and worthless Repellers to unsuspecting consumers.

77.    Plaintiff and members of the Class and Vermont Subclass did not have knowledge that the Repellers did not work.

78.     The false and misleading representations and omissions were made by Defendant, upon which Plaintiff and members of the Class and Vermont Subclass reasonably and justifiably relied, and were intended to induce and actually induced Plaintiff and members of the Class and Vermont Subclass to purchase the Repellers.

79.     The fraudulent actions of Defendant caused damage to Plaintiff and members of the Class and Vermont Subclass, who are entitled to damages and other legal and equitable relief as a result.

## COUNT V

### Violation of the Magnuson-Moss Warranty Act
### 15 U.S.C. §§ 2301, *et seq.*

80.     Plaintiff hereby incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

81.     Plaintiff brings this case individually and on behalf of the members of the Class and Vermont Subclass against Defendant.

82.     The Repellers are a consumer product as defined in 15 U.S.C. § 2301(1).

83.     Plaintiff and members of the Class and Vermont Subclass are consumers as defined in 15 U.S.C. § 2301(3).

84.     Defendant is a supplier and warrantor as defined in 15 U.S.C. § 2301(4) and (5).

85.     In connection with the sale of the Repellers, Defendant issued written warranties as defined in 15 U.S.C. § 2301(6), which became the basis of the bargain and warranted that it is a "Rodent Repeller" that repels rodents through "ultrasound" technology.

86.     In fact, the Repellers are ineffective for their intended purpose of repelling rodents, and do not conform to these representations. Accordingly, Defendant breached the terms of the

warranty between the Parties including the warranties on the Repellers labeling by not providing the Repellers in a manner that conformed to the affirmations and promises.

87.     By reason of Defendant's breach of warranty, Defendant violated the statutory rights due to Plaintiff and the members of the Class and the Vermont Subclass pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*, thereby damaging Plaintiff and the members of the Class and the Vermont Subclass.

88.     Plaintiff and the members of the Class and the Vermont Subclass were injured as a direct and proximate result of Defendant's violation because (a) they would not have purchased the Repellers if they had known that they were ineffective for their stated purposes, and (b) they overpaid for the Repellers on account of the misrepresentations that it is a "Rodent Repeller" that repels rodents through "ultrasound" technology.

89.     Plaintiff and the members of the Class and the Vermont Subclass performed all conditions precedent under the contract between the Parties.

90.     Within a reasonable time of discovering the breach of express warranty by Defendant, Plaintiff notified Defendant of the breach of warranty (*see* **Exhibit A** attached). The notice was sufficient to let Defendant know the nature of the breach.

## **RELIEF DEMANDED**

91.     WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.     For an order certifying the Class and the Vermont Subclass under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as representative of the Class and Vermont Subclass and Plaintiff's attorneys as Class Counsel to represent the Class and Vermont Subclass members;

b.     For an order declaring that Defendant's conduct violates the statutes referenced herein;

20

c.   For an order finding in favor of Plaintiff, the Class, and the Vermont Subclass on all causes of action asserted herein;

d.   For compensatory, statutory, treble, and punitive damages in amounts to be determined by the Court and/or jury;

e.   For prejudgment interest on all amounts awarded;

f.   For an order of restitution and all other forms of equitable monetary relief;

g.   For an order awarding Plaintiff, the Class, and Vermont Subclass their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Respectfully submitted,

Dated: February 14, 2026

BARR LAW GROUP
Russell D. Barr

By:          /s/ Russell D. Barr
                RUSSELL D. BARR

125 Mountain Road
Stowe, VT 05672
Tel: 802/253-6272
802/253-6055 (fax)
russ@barrlaw.com

BURSOR & FISHER, P.A.
Yitzchak Kopel (*pro hac vice forthcoming*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: 646/837-7150
212/989-9163 (fax)
ykopel@bursor.com

Stephen A. Beck (*pro hac vice forthcoming*)
701 Brickell Ave, Suite 2100
Miami, FL 33131
Tel: 305/330-5512
305/676-9004 (fax)
sbeck@bursor.com

BLOOD HURST & O'REARDON, LLP
Timothy G. Blood (*pro hac vice forthcoming*)
James M. Davis (*pro hac vice forthcoming*)
501 West Broadway, Suite 1490
San Diego, CA  92101

Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
jdavis@bholaw.com

*Attorneys for Plaintiff*